I'm sorry. John Gard for the petitioner. Yes, try and talk into the mic, please. If it will please the court. The Chanery Doctrine, which has been appropriately raised by respondent, requires a review of the totality of the circumstances and all relevant factors that require review, consideration, including corroborative human rights documentation, in addition to that, judicial notice to facts of, to undisputed facts. Now, in this case, we're concerned that the petitioner was never given the opportunity to reply to matters of concern to the Immigration Court, or if he did, his explanations were ignored and not commented on and were replaced by speculative findings without any judicial notice to just common-sense facts, for instance. It's helpful to me. I mean, you notice that the government has essentially walked away from some of what's in its brief, which was relying on credibility factors that the government didn't find? Right. Right. So why don't we go through, but they did list what they thought were the remaining credibility factors that the BIA. I'm going to list seven. I'm sorry? I'm going to list seven. What? I'm going to list seven. Oh, yes. Okay. Go ahead. Well, first, there's the individual's religion, and they used his use of different names. There's the first and the last non-Sikh name. The use of different names was not one of the things that the BIA relied upon, was it? Yes. This is why I'm asking you to concentrate on the things they did rely upon. Well, they relied upon whether or not he was truly a Sikh, whether or not he had the turban and the beard. But this is the expression of advanced Sikh practice. You know, the petitioner himself explained that he's a Siddharthi, which is basically a beginner or slow adapter, the beginning Sikh. But the advanced Sikh, the Amritdharti, is the Sikh who is baptized. The fact that he's not baptized is not an indication that he's not a Sikh. It means that he's not an advanced Sikh, that he doesn't wear the turban, he doesn't wear the beard, he doesn't carry the sword, and he's not eligible to become a grantee, a priest. But then at the same time, he's representing that he's actively involved in a pro-Sikh organization before he comes to the United States. Is that, it may not be dispositive, but is that inconsistent with, you know, with that lack of baptization or whatever? Not at all. You don't have to be a baptized Sikh to be a Sikh. You have to be a baptized Sikh to be a priest. But he can have a political conviction, and he did. There are a lot of people in the United States who were Unitarian, and if, and if, but Okay. But if you're Unitarian, oh my Lord. But, but, and if you, and if you come at them with anti-Semitic language, you'll get Jewish real quick. I know a few people like that. This is the same type of situation where you have people who are practicing Sikhs, they not be, not be advanced in their practice. Baptism isn't a right of passage. It's a right to become a priest. So what, so say we agree with you that the agency erred in, in this issue about whether he needed to be a more practicing Sikh. There still were a bunch of other reasons that had to do with his demeanor, and the documents, and the father speaking English, all these things. So can you speak to whether the agency could rely on those other ones? Well, as far as demeanor is concerned, the Ninth Circuit in Carr v. Holder has said when the testimony is, Carr v. Holder is 561 Federal 3rd 957 at 962 and 963. They have said that where the person's testimony is entirely credible, you just can't rely on their demeanor solely as a grounds to find them lacking credibility. That's not what the agency did here, right? Because they thought there were a lot of other reasons. I'll get to them. In addition to that, there's the false document. It's not a false document. The, the petitioner explained how the document was made. It was made in rural Punjab. It was made by a, a marginalized political faction through the means that they had at the time. They used security paper. It was stamped, and they had the photo put onto that paper. In fact, the USC, the USINS, the legacy INS, used to make work cards the exact same way on security party paper. You gave them the photo. They'd cover it with plastic. They'd seal it. Until 1996, they started using more secure methods. But this is the rural Punjab, and this is very strange that the judge just forgot what our country used to do before 9-11. But in addition to that, we have the issue of the documentation provided for medical treatment after the fact. In rural Punjab, you cannot keep contemporaneous documentation. Let there be judicial notice, as required under the Cheney Doctrine. Kagan. Kagan. Well, wait a minute. Just hold on a minute. What, what he said was that he, at, at the hearing originally was they didn't give me anything. Exactly. But he didn't say that he didn't keep any records. They didn't give him anything because they don't keep them. They don't keep them because it's a — How do we know that? You're saying it's judicially noticeable that there are no medical records? Let me explain. Yes. It's just common sense. Can I explain, please? But, but wait a minute. No. How is the fact that they produced this document now inconsistent with them having records? How do we know they didn't have records? Why, why wouldn't — Thank you. Why does it matter whether they have records? I'm trying to explain, Your Honor. Okay. It's 100 degrees. It's 100 percent humidity. It's rural Punjab. These are poor farmers. They pay cash. It's not a well-funded clinic. What's the point of keeping records on soft paper when a year later it's just going to be an inkblot? And that can be found simply by looking on the Internet and looking at the climatic conditions. Okay. But I'd like to understand something. Yes, ma'am. I, I think you're trying to prove more than you have to prove on this one because all he said originally was he didn't give me — they don't give you a document. No, they don't. He didn't say they don't keep any documents and there's no reason why this couldn't have been written off a document that they did have. So they give it after the fact in broken English and are in a, in completely incomprehensible affidavits made after the fact. Right. And, and this was by medical professionals in India who don't speak proper English and it was hard to know if they were speaking of themselves or the, the respondent's or the petitioner's mother. But the fact, the fact the document is dated four years after the visit may not be dispositive unto itself, but it again is one of the factors that leads to weighing credibility, isn't it? No, not, not at all. It just remains in the, it, it, it weighs into the probativeness of the document itself. Contemporaneous documentation is very helpful for a petitioner. I'm going to, I want to cite, if I may, Vera Viegas, V-I-N-S, 330 Federal 3rd, 1222, which says that adding to, that, that contemporaneous documentation adds to witness credibility, but is not indispensable. The documents say what medicines he gave him in great detail. So it seems extremely unlikely that he could have remembered this without having any records. But I don't understand why you're conceding that he didn't have any records, the doctor. I mean, the doctor could have had the records, and then when they asked him for the documentation, he went and looked at the records. I mean, why are you insisting that he didn't have any records? Well, I'm not insisting he didn't have any records. I'm insisting that the, that the government can't prove that he did have records. But if he didn't have records, how could he have possibly said I gave him the following medicines? One, bolini gel, two, mobigel, three, ziffy, 2,000 milligrams, 200 milligrams. I mean, there's no chance he would have remembered that if he didn't have any records. But why would he have had any records? It may be standard treatment for a beating. All right. I don't understand why you're. And they might have had a number of Sikh activists being beaten. But the fact that you've just argued essentially that probably there weren't records, that they weren't kept because it was 100 degrees and 100 degrees temperature and, you know, precipitation levels. So he's left after the fact attestation, which is probably what it was, although we don't know. The point is the judge deciding what this document was, was a matter of the judge's speculation as to what should have been available and what shouldn't have been available. And in fact, is the judge's being speculation. It was the immigration judge's being speculative. And what this document did is it failed to prove anything, but it didn't go to his credibility. All right. And there's a last one, which is the father's English declaration. That, again, doesn't, it doesn't prove anything. It goes to the probativeness of the documentation. The judge is speculating that certifications are produced by non-attorney service provider is next to a court. These attestations say that they're not judicial documents. And so they have a bilingual service provider providing the affidavit in English. You're right. It doesn't attest that the document was read back in Punjabi. And so it's not terribly probative, but it doesn't mean that it discredits the inherently detailed and consistent testimony of the respondent. And I'd like to add one more thing. They talked about both detentions and arrests, but the court itself and the board left out that he was stopped along the side of the road and beaten by mobs that he thought were Hindu and received calls by the mainstream party faction, when in fact, he recounted this from his affidavit on cross-examination, consistently, which is quite a feat. That means that you have to have lived it and memorized it. I'm in the red right now. Okay. Well, that's fine. Why don't you give me a minute in rebuttal? Thank you. I want to first thank you for your letter because I was very troubled by the mismatch between the BIA opinion and the brief, so I appreciate your recognizing it. And I, you know, again, do apologize for that. It was improper, and we tried to correct it as soon as we found it. Okay. Good afternoon. So my understanding is that the changing stories about when he came into the country, as well as the name, you're not relying upon? Correct. Everything that we cited in our 28-J letter is, you know, we're essentially withdrawing those arguments. Chenery very specifically specifies that this court can only base its decision on the, you know, grounds that are rooted in the agency's decision. And so we're only left with those, and, you know, that's what's before the court. So, Your Honors, this court should deny the petition for review because the immigration judge, as affirmed by the board, gave specific and cogent reasons, given the totality of the circumstances, to find Singh not credible. And Mr. Singh has not demonstrated that the record compels a contrary finding. I'd like to start with a demeanor finding to begin with. The immigration judge specifically noted stiffness and crossed arms. This court recently in Huang noted that how a witness sits is part of a demeanor finding that's valid. But it's essentially unreviewable. I mean, it's troubling because different people communicate in different ways. They're also culturally bound as well. And in this instance, what they said specifically, that his stiffness, crossed arms, and wrote testimony were inconsistent with someone who suffered the horrific abuse described in his declaration. I don't know what that means. I mean, he's supposed to be crying? Is that the idea, or what? Again, I think this goes to the root and mechanical method in which he did give his testimony. It's also that the immigration judge noted that it seemed rehearsed. In Kapoor v. Gonzales, it is an unpublished decision. I would hope it's rehearsed. Isn't all testimony rehearsed? But there's a manner in which, and this is, admittedly, we recognize that demeanor findings are that typical case that's particularly hard to determine. But that's why this court gives special deference to it. Because the trial judge is the one evaluating the applicant who's there in the courtroom looking at visual cues that are not apparent from the record. This court has held that such determinations will be based on nonverbal cues. And few, if any, of these ephemeral indicia of credibility can be made on paper record of the proceedings. And it would be extraordinary for a reviewing court to substitute its second-hand impression for the petitioner's demeanor. I want to reiterate, when Congress enacted the REAL-ID Act, demeanor was the first thing that they put on the list. Congress said, credibility determinations, that the immigration alone is in the best position to observe the tone and demeanor, to explore inconsistencies. And this really goes to who's in the best position to look at this. It's the trial judge. And with regards to petitioner's argument about the PTSD, while that is a very valid concern, that is something that the alien can address. But petitioner, in this particular case, submitted no evidence that he's been diagnosed with PTSD. If that is the case in any other, you know, in a future case, Your Honor, you know, the medical evaluation can be submitted with that. If it happens after the testimony, they can file a motion to reopen with the immigration judge if they are diagnosed with it, if it goes to the demeanor finding. But what we have here is this court requires that it not be boilerplate. The immigration judge... It not be what? I'm sorry, boilerplate. So in other words, that it can't just say, oh, demeanor and move on. They have to give specific reasons that this Court can look at. And they did so in this case. Again, the stiffness, the crossed arms, the rote and mechanical testimony, the inconsistency with someone who, like, in the lens who suffered these horrific acts, all of that in that didn't add up to the immigration judge who was there observing him. Again, this Court requires that there be place on the record and... And I remember that with regard to how much credence we give to the demeanor testimony, that I would say that at least two of the other reasons that were given were really, you know, not valid. I mean, one was this thing about the religion. I mean, I keep thinking, who founded the State of Israel? A whole bunch of secular Jews because they cared about the fate of the Jewish people, but they weren't religious. They were specifically not religious. So what does this prove? So if I address that in turn, even if the demeanor finding stands, which it should because Petitioner has not demonstrated that anything compels a contrary finding, even in pre-real ID law, this would be sufficient to sustain the adverse credibility determination. But particularly in post-real ID... But doesn't or should the fact that their judge was relying on other things? I understand that theoretically one is good enough. But when the one is demeanor, which is really not testable, and then there are other things that are said that just don't stand up, like the religion thing, which to me just doesn't stand up. And similarly, the notion that there was somewhere said that he said that he was an active member, even though it was issued in the very day that he responded and joined the party. When I joined the Bar Association, it says active member the day I joined it, right? Yes, Your Honor. So a lot of this is just silly. If I can address them in turn, so with regards to what you just said about the active membership portion, the board did not affirm that portion of the IJ's decision. Again, it only used the fact that it was crudely pasted on to the document. And again, the party membership card, if we put this into context... But I'm sort of looking at it another way. The demeanor evidence is just the IJ, right? Because the board has no more ability to review it than we do. So if the IJ was saying other things that just don't make a lot of sense and may either suggest some bias or something, then doesn't that undermine or, in my mind, it undermines the demeanor conclusion? Even if Your Honor felt that certain aspects of the immigration judges weren't supported by substantial evidence, that doesn't mean that all of them. They gave multiple reasons. There were three specific documents that they questioned between the party membership ID, which looked crudely pasted on and which he had an opportunity to corroborate and was on notice of that, as well as the father's affidavit, which was a non-English speaker writing in that the federal regulations require that the foreign language document be accompanied by the English translation and a certificate. So the result of that is you throw it in, which is what your opponent said. I mean, it doesn't comply with the rules. You don't – we're not going to accept it. It doesn't corroborate anything. It's gone. But why does it prove that it was lying? Again, that was just that it was given less weight. It was, you know – the immigration judge is assessing this in the totality of the circumstances. So you having someone who is going to be the – you know, observing the demeanor of it coupled with now we have at the initial hearing he submitted none of these documents. The IJ said, you know what, here are some corroborating issues. The attorney admitted that and said, hey, I'd like, you know, a continuance. Can I get three months to submit these documents? He comes back and the documents have problems. They have issues with reliability. And the immigration judge gave specific reasons for why those documents had reliability issues. The medical documentation, for example, that's one of the things that was belatedly offered, not contemporaneously prepared. And I think the real issue there was – Except for the way your opponent argued it. Because if I go to my doctor and I say, you know, I want you to write a letter about when I was here four years ago, what was my problem? He could do that. No problem. I think the issue here was that, you know, first you have these documents that give the specific drug down to the number of pills down to the milligram. If I went to my doctor – I mean, we were just told that they don't keep records. But if they did keep records – and I went to my – as my doctors do, and I asked for – I mean, as I do sometimes, I need a letter saying, you know, what happened four years ago? They can do it. No problem. Right. Including the specifics of the medication and everything else and what day and what time and everything else. So – but the issue there would be that there would – you would likely be able to either submit the original records because they kept them and that's how they derived them. Here, there's no evidence of how they got these documents. That's what's really troublesome, right? It's not just that these letters came four years later or were created contemporaneously. That just went to the persuasiveness of it. Documents – Isn't there also this inconsistency about whether he was actually at the doctor in person? Because the doctor says, I saw bruises, and he says he was never at the doctor? That's correct, but again, that's not specifically listed in the decision. But that is – there are questionable other components to the medical documentation. That's not – that dispute, in fact, is not something that you're relying upon? Well, because we're limited to just what the documents said. The reasons that the immigration judge said – I don't believe the immigration judge particularly picked up on the difference of the language. If they did, then that is – So the fact that they didn't talk about the documents – That is certainly another ground for them to be unreliable. But if the agency didn't specifically say that and incorporated it into its decision. I would like to just briefly talk about the appearance, because I know that's a concern to you, Your Honor. The main issue here is that he's presenting a persona of somebody who is extremely active in politics. And not just politics, because the Akali Dalman party is intrinsically intertwined with his religion. They are pro-Khalistan or for an independent Sikh state. This Court in several unpublished decisions, Kuldeep Singh v. Holder, 2009, Westlaw 688916, held a very similar situation where the alien was a member of the Akali Dalman party. And they argued that the IJ improperly based the adverse credibility decision on his non-observance of orthodox Sikh practices. And the Court of Appeals upheld the adverse credibility determination on that ground, in part based on the failure – He said, I do it, and then he doesn't present that way. That's one thing. But I've read a lot of these transcripts now. This guy was pretty responsive and pretty explanatory, and he was pretty explanatory about this. He didn't say, I'm a really serious orthodox Sikh. He said, I'm not. Again, this is really – just to answer your question, I see I'm getting close to out of time. But, you know, while he did say, look, there are different levels of Sikhs, and I fall on kind of the other end. The idea is that regardless of where you fall on the orthodox, that if you are going to be a zealous advocate, you are going to rallies, you are putting, you know, black posters and black flags around and passing them around, and you are risking your life and personal peril to promote this independent Sikh state, that you would then have at least some realm of – of supporting black voting rights who weren't black and didn't have any voting rights problems. It's just a funny business if they're – if he's being upfront about what his connection was. He's not representing himself as something that he wasn't. I don't understand why he needs to be an orthodox Sikh to support this position. Again, this Court has not held that you have to be an orthodox Sikh. It's just that it's inconsistent with the general image that he is trying to promote, which is that you're just very active into this. Again, I would just reiterate that, you know, at the end of the day, this Court, even if it could draw inconsistent conclusions, that is not the standard of review. You can have inconsistent conclusions and still have the evidence be supported by substantial evidence. On this record, he has not compelled a contrary conclusion. We're out of time, but thank you for your endless help. Sir. One minute. The Court acknowledges that Respondent didn't puff up his application. In fact, he humbled it, and he humbled it significantly. The Court, please acknowledge that he doesn't have to be a leader of a movement to be subject to a movement that, once you join this movement, succession from India, the Punjab police will be very displeased with you. In addition to that, I've already raised the issue of the after-the-fact doctor's letters made in really poor English, where it was really not clear if the doctor was testifying as to the mother's testimony or his own. And I would ascribe that to needing to study for and pass the TOEFL examination. And finally, the Respondent didn't claim to be a leader. He was following the footsteps of his father, and it didn't work out too well for him. Submitted. Thank you very much. The case of Singh v. Sessions is submitted, and we'll go to Doughty v. Metropolitan Life.
judges: Berzon, Friedland, Sessions